# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELENITA H. MONDARES, | Case No. 10cv02676 BTM (WVG) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| KAISER FOUNDATION HOSPITAL, et al., | |
| Defendants. | |

Defendants Kaiser Foundation Hospitals ("KFH"), Southern California Permanente Medical Group ("SCPMG"), and Deborah Revier ("Revier") (collectively, "Defendants") have filed a motion for summary judgment. For the reasons discussed below, the Court **GRANTS** the motion for summary judgment.

## I.  FACTUAL BACKGROUND

Plaintiff Elenita H. Mondares ("Plaintiff") began working at SCPMG as a Laboratory Assistant in May 1999. Part of her duties as Laboratory Assistant included drawing blood and processing specimens. She was subsequently promoted to Clinical Laboratory Scientist ("CLS") in September 2002, a position that she held until her termination on November 13, 2007. During the entire time she was employed as a CLS at SCPMG, Plaintiff was a member of the trade union United Food and Commercial Workers, Local 135.

1    Plaintiff usually worked the weekend graveyard shift at a 24-hour laboratory, from

2   10:00 p.m. on Saturday night until about 8:00 a.m. on Sunday morning, and then again on

3   Sunday night until Monday morning.  Depending on the time of day, Plaintiff reported either

4   to the morning supervisor, Defendant Deborah Revier, or the afternoon supervisor, Diane

5   Giles.  Ms. Giles and Defendant Revier both reported to Laboratory Director Linda Mercurio.

6   Plaintiff has testified, and Defendants have not disputed, that Ms. Mercurio, Ms. Giles, and

7   Defendant Revier are all Caucasian.  Plaintiff has stated that she is Asian/Filipino.

8    As a CLS, Plaintiff was primarily responsible for performing tests for clinical laboratory

9   procedures on patient specimens such as blood and urine, and reporting test results.  Such

10  tests are done in various departments in the laboratory, including Hematology, Urinalysis,

11  and Chemistry.  Plaintiff was also responsible for checking the laboratory equipment and

12  making reagents and quality control materials for use in the laboratory.  Reagents are

13  chemicals used to conduct the different tests.  Quality control materials are used to test the

14  validity of the reagents being used.  While Plaintiff was technically required to run a quality

15  control check on each batch of reagent she prepared, she has alleged that the informal

16  procedure established at the laboratory was that if someone did not have enough time to run

17  the control, he or she would write on the container and/or communicate to the person

18  starting the next shift that the control had not been run on the batch of reagent.

19   In February 2007, Plaintiff was issued a "Level 4 Corrective Action" for an incident in

20  October 2006 in which SCMPG determined that she had issued the wrong type of blood for

21  an infant,[1] although Plaintiff denies this.  There is insufficient evidence in the record

22  regarding a five-level disciplinary process that Defendants refer to in their statement of

23  undisputed facts.  However, it is undisputed that in February 2007, Plaintiff was required to

24  sign a "Last Chance Agreement" agreeing to change her behavior or terminate her

25

26    [1]Under the laboratory's policy, if a patient's blood type is unknown or has not been
determined, O Rh negative blood must be issued.  It is undisputed that Plaintiff issued O Rh
27  positive blood.  According to the disciplinary paper, Plaintiff was found to have issued O Rh
positive blood before the infant's blood type was known, see Def. Mot. for Summ. Judg., Ex.
28  I (ECF No. 24-5 at 33-35), although Plaintiff claims that she screened the infant and issued
the correct type of blood for the infant's blood type.

1   employment.   There do not appear to have been any prior disciplinary actions against

2   Plaintiff.

3          The next disciplinary action taken against Plaintiff related to the events of October 8,

4   2007.  Plaintiff was working in the Hematology/Coagulation Department.  Toward the end

5   of her shift that day, Plaintiff made additional batches of the reagents Innovin, DVT, and

6   Factor 10 because she knew the laboratory was short-staffed.  However, she did not have

7   time to run the quality control tests and was not authorized to work overtime.  According to

8   Plaintiff, she put the bottles of reagent in the laboratory refrigerator and placed brown tape

9   around the bottles, marking the tape with her initials, the date and time, and "not QC'd" to

10  indicate that she had not run the control.  She also testified at her deposition that she told

11  two Clinical Lab Scientists starting the morning shift, Ms. Vonnie Thorson and Mr. Terry

12  Moelter, that she had made the reagents but did not have time to run the quality control tests

13  on them.  She did not tell Defendant Revier because Ms. Revier was not in the laboratory

14  and Plaintiff was unable to find her.

15         Defendant Revier testified at her deposition that around noon that day, another CLS

16  who had been assigned to work in the same department, Christy Donato, ran quality control

17  tests on reagents that she herself had made, which came back in the acceptable range.  Ms.

18  Donato then proceeded to run patient tests and notified Defendant Revier at approximately

19  4:00 p.m. that there was a problem with the results.[2]  Defendant Revier told Ms. Donato to

20  stop releasing the test results. They then ran a quality control test on the reagent (Innovin)

21  that Ms. Donato had been using, and the results were outside the acceptable range.

22  Defendant Revier then threw away the Innovin so it would not be used and she and Ms.

23  Donato made a new batch that they then tested for quality control.  Since the new reagent

24  was in the acceptable range, they began re-running the tests for the patients whose results

25  had initially come out the same, and received different results.  Defendant Revier testified

26  that she concluded that the abnormal results started occurring when Ms. Donato had begun

27  _____

28       [2] Ms. Donato had been running coagulation tests (testing how long it took for patients'
    blood to clot), and knew there was an error because the tests were all producing the same
    result.

10cv02676 BTM (WVG)

1   using the reagent that Plaintiff had left in the refrigerator.  Ms. Donato told her that she had

2   not seen any label saying "Not QC'd" on the reagent Plaintiff had prepared, and was

3   eventually also disciplined through a Level 2 Corrective Action for her role in releasing the

4   erroneous test results.  Defendant Revier stated in a separate declaration that after re-

5   running all the tests, it was discovered that at least one patient had a critical value[3] test result

6   that usually requires immediate hospitalization and other patients had critical values that

7   require immediate physician notification.  Revier Decl. at 3 (ECF No. 24-7).   Plaintiff

8   disputes all of the above, but has not offered any evidence in contradiction.

9       Two days later, on October 10, Plaintiff received a phone call from Diane Giles, the

10  night-shift CLS laboratory supervisor, who asked if Plaintiff had made the reagents on that

11  shift and whether she had run the quality control tests.  Plaintiff explained what happened,

12  and inquired why Ms. Giles was asking, and Ms. Giles told her that there was a problem

13  regarding the test results for 100 patients.

14      Then, on October 15, Ms. Mercurio called Plaintiff and told her that she wanted to

15  meet with Plaintiff and her union representative later that morning to discuss the incident.

16  At the meeting, before the union representative arrived, Ms. Mercurio asked Plaintiff to

17  explain what happened on the morning of October 8, which she did voluntarily.  Defendant

18  Revier then joined the meeting upon Ms. Mercurio's request, and told Plaintiff that she had

19  made the reagent incorrectly.  At the end of the meeting, Ms. Mercurio placed Plaintiff on

20  paid suspension and told her that she would investigate the matter.

21      On November 2, 2007, Plaintiff and her union representative met with Ms. Giles and

22  another CLS supervisor Diane Johnson as part of the investigation, and Plaintiff explained

23  again what had happened.   Finally, on November 13, 2007, Plaintiff and her union

24  representative met again with Ms. Giles and Ms. Johnson, and Plaintiff was told that her

25  employment was being terminated.  She was also given a form setting forth the reasons for

26  her termination, which included the determination that she made reagent incorrectly with

27  

28  
_____

[3] "Critical values" refer to when patient test results are outside of the designated
normal range.  The CLS is responsible for reporting such results to the patient's physician.

1    potentially serious results for the patients, as well as citing to the prior Level 4 Corrective

2    Action.  See Def. Mot. Summ. Judg., Ex. L (ECF No. 24-5 at 50).  It also states that during

3    the course of the investigation, management also discovered that on September 17, 2007,

4    Plaintiff had failed to run a critical value list at the end of her shift and did not call a patient's

5    critical value in to a physician.  See id.

6        Plaintiff's Second Amended Complaint ("SAC") alleges causes of action for (1)

7    employment discrimination based on race in violation of Cal. Gov't Code § 12940; (2)

8    employment discrimination based on age in violation of Cal. Gov't Code § 12940; (3)

9    wrongful termination in violation of public policy; (4) intentional infliction of emotional distress;

10   (5) negligent infliction of emotional distress; (6) breach of contract; (7) breach of implied

11   contract to terminate only for good cause; (8) breach of the covenant of good faith and fair

12   dealing; and (9) defamation of character.

13       On March 20, 2012, Defendant filed its motion for summary judgment, or, in the

14   alternative, partial summary judgment.

15

16                    **II.  SUMMARY JUDGMENT STANDARD**

17       Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil

18   Procedure if the moving party demonstrates the absence of a genuine issue of material fact

19   and entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322

20   (1986).  A fact is material when, under the governing substantive law, it could affect the

21   outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman

22   v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could

23   return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

24       A party seeking summary judgment always bears the initial burden of establishing the

25   absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party

26   can satisfy this burden in two ways: (1) by presenting evidence that negates an essential

27   element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party

28   failed to establish an essential element of the nonmoving party's case on which the

1  nonmoving party bears the burden of proving at trial. Id. at 322-23. "Disputes over irrelevant

2  or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc.

3  v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

4      Once the moving party establishes the absence of genuine issues of material fact, the

5  burden shifts to the nonmoving party to set forth facts showing that a genuine issue of

6  disputed fact remains. Celotex, 477 U.S. at 314. The nonmoving party cannot oppose a

7  properly supported summary judgment motion by "rest[ing] on mere allegations or denials

8  of his pleadings." Anderson, 477 U.S. at 256. When ruling on a summary judgment motion,

9  the court must view all inferences drawn from the underlying facts in the light most favorable

10  to the nonmoving party.    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

11  587 (1986).

12

13                                    III.  **DISCUSSION**

14      Defendants move for summary judgment on all of Plaintiff's claims. As discussed

15  below, the Court finds that Plaintiff has failed to raise a triable issue of material fact with

16  respect to her claims and therefore grants summary judgment in favor of Defendants.

17

18  **A. Defendant KFH**

19      Defendants argue that Defendant KFH should be dismissed because all of Plaintiff's

20  claims against it presume that KFH was Plaintiff's employer, which it was not. The Court

21  agrees.    Plaintiff's claims all relate to the events surrounding the termination of her

22  employment. She has offered no direct evidence that anyone formally working for KFH was

23  involved in the decision-making process leading to her termination, or even in her day-to-day

24  employment prior to termination, so the only way that she may state any of her claims as

25  against KFH is if SCPMG and KFH are one enterprise under the "integrated enterprise" test

26  articulated in Laird v. Capital Cities/ABC, Inc., 68 Cal. App. 4th 727, 80 Cal. Rptr. 2d 454

27  (1998). But as the court in Laird noted:

28          An employee who seeks to hold a parent corporation liable for the acts or
            omissions of its subsidiary on the theory that the two corporate entities

1
2
3

> constitute a single employer has a heavy burden to meet under both California and federal law.  Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result.  In particular, there is a strong presumption that a parent company is not the employer of its subsidiary's employees.

4   Id. at 737 (citations omitted, emphasis added). Because the evidence on the record is not

5   clear as to the corporate relationship between KFH and SCPMG, the Court will treat KFH for

6   the purpose of the analysis as the parent of SCPMG, although the analysis holds even if

7   KFH and SCPMG are otherwise affiliated.

8       The "integrated enterprise" test has four factors: interrelation of operations, common

9   management, centralized control of labor relations, and common ownership or financial

10  control.  Id.  However, "common ownership or control alone is never enough to establish

11  parent liability."  Id. at 738 (citing Frank v. U.S. West, Inc., 3 F.3d 1357, 1364 (10th Cir.

12  1993)).  Plaintiff must show that KFH controlled SCPMG's day-to-day employment decisions,

13  or otherwise exercised control over SCPMG "to a degree that exceeds the control normally

14  exercised by a parent corporation."  See id.  Plaintiff has fallen far short of this burden,

15  relying only on a single unrelated NLRB case in which KFH and SCPMG were both listed as

16  employers pursuant to a stipulated election agreement, a printout from Kaiser Permanente's

17  website giving a generic description of its business operations, stray references *by counsel*

18  to "Kaiser" as Plaintiff's employer during her deposition, and Defendant Revier's

19  acknowledgment that KFH was "part of the entity" where she works.  See Pl. Opp. Mot.

20  Summ. Judg. (ECF No. 25) at 8-9.  Therefore, the Court **DISMISSES** all claims against KFH.

21

22  **B.  Race/Age Discrimination**

23      California's Fair Employment and Housing Act (FEHA) makes it unlawful for an

24  employer to discriminate or harass on the basis of race or age.  Cal. Gov't. Code § 12940(a),

25  (h)(1).  "In applying FEHA, federal and state courts have employed the shifting burden of

26  proof applied to Title VII discrimination claims as established in McDonnell Douglas Corp.

27  v. Green, 411 U.S. 792, 802 (1973)."  Maurey v. Univ. of S. California, 87 F. Supp. 2d 1021,

28  1038 (C.D. Cal. 1999).  Under McDonnell Douglas, the employee bears the initial burden of

1  establishing a *prima facie* case of intentional discrimination on the basis of his membership

2  in one of the protected classes.  411 U.S. at 802.  The burden then shifts to the employer

3  to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id.

4  If the employer articulates such a reason, the plaintiff can prevail only if he or she can prove

5  that the articulated reason was pretextual and that the discrimination based on race or age

6  was a substantial factor in defendant's adverse employment action.  See id. at 804.

7       To establish a *prima facie* case of intentional discrimination, Plaintiff must

8  demonstrate "actions taken by the employer from which one can infer, if such actions remain

9  unexplained, that it is more likely than not that such actions were based on a prohibited

10  discriminatory criterion."  Guz v. Bechtel Nat. Inc., 24 Cal. 4th 317, 355, 8 P.3d 1089, 1113

11  (2000) (internal quotations and alterations omitted).  In general, plaintiffs alleging

12  discrimination under the FEHA must show that: (1) they are a member of a protected class;

13  (2) they were performing their job competently; (3) they suffered an adverse employment

14  action, in this case termination; and (4) some other circumstance suggests discriminatory

15  motive.  See id.

16       Plaintiff is an Asian/Filipino female over the age of 40, and it is undisputed that she

17  is a member of a protected class for both race and age (she was 48 at the time of

18  termination).  It is undisputed that her employment was terminated.  Therefore, the only

19  points left in dispute are whether Plaintiff was performing her job as CLS competently and

20  whether there is any circumstantial suggestion of discriminatory motive as to race, age, or

21  both.

22       There is conflicting evidence in the record as to whether Plaintiff was performing her

23  job competently.  Plaintiff has alleged that she followed laboratory procedure by marking the

24  bottles containing the reagent she had made as "not QC'd" to indicate that the reagent had

25  not undergone quality control testing.  She further disputes the accuracy of the earlier

26  disciplinary action in February 2007.  Because the Court must construe all inferences drawn

27  from the underlying facts in the light most favorable to Plaintiff as the nonmoving party, it

28  assumes for the purposes of summary judgment that Plaintiff was performing her job

competently, thus casting doubt on Defendants' proffered reasons for termination. Therefore, Plaintiff has established a *prima facie* case of discrimination, and the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.

As long as Defendants' reasons for terminating Plaintiff were non-discriminatory, they "need not necessarily have been wise or correct." Guz, 24 Cal. 4th at 358. "While the objective soundness of an employer's proffered reasons supports their credibility..., the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*." Id. (emphasis in original). Defendants have articulated non-discriminatory reasons for terminating Plaintiff based on SCPMG's determination that she had made serious mistakes during her employment on multiple occasions. The legitimacy of these reasons for terminating Plaintiff, regardless of the accuracy of the underlying facts, is supported by ample evidence in the record that Defendants conducted an investigation into the cause of the faulty reagents, as well as the earlier incident in October 2006, that indicated that Plaintiff had violated procedures. The burden thus shifts back to Plaintiff to prove that these reasons were merely pretextual.

In order to show that the reasons were pretextual, Plaintiff must do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Zeinali v. Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011) (quoting Dawson v. Entek Int'l, 630 F.3d 928, 934-35 (9th Cir. 2011)).

Plaintiff has claimed both age and race discrimination. Aside from the fact of her termination, Plaintiff has not shown any circumstances indicating that she was discriminated against due to age. In fact, according to the declaration of a Human Resources employee, at the time of the incident Defendant Revier was 54 years old, Ms. Mercurio was 57 years old, Ms. Giles was 47 years old, Ms. Johnson was 55 years old, Mr. Moelter was 58 years old, Ms. Thorson was 57 years old, and Ms. Donato was 30 years old. Rosengard Decl. (ECF No. 24-8) ¶¶ 3 & 4. In other words, the only other employee disciplined for the events

of October 8, 2007, Ms. Donato, was the only employee *not* in the protected age class. There is no other evidence in the record pointing to age discrimination, and the termination alone is insufficient to present a triable issue of fact.  See Guz, 24 Cal. 4th at 362 (summary judgment for employer may be appropriate where "any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred").  Therefore, the Court finds that Defendants are entitled to summary judgment as to Plaintiff's claim for employment discrimination on the basis of age.

With regard to Plaintiff's claim of race discrimination, her *prima facie* case is somewhat stronger.  She and Ms. Donato, the only two employees disciplined in connection with the reagents incident, are both Filipino, but the remainder of the employees connected to the incident are Caucasian.  Nonetheless, "the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." Id. at 361. All Plaintiff has alleged is that the Caucasian employees connected to the incident were not disciplined.  However, neither of the Caucasian Clinical Laboratory Scientists on scene, Mr. Moelter and Ms. Thorson, actually participated in the making of the reagent.  Rather, their role was limited to Plaintiff telling them that she had not run the quality control tests on the extra reagent she had made.  Ms. Donato, the other Filipino CLS, was the one who actually ran the patient tests using the reagent and released the erroneous results, and she was disciplined accordingly.  Plaintiff asserts that an eye witness also saw Defendant Revier running the tests with the faulty reagent, see Pl. Opp. (ECF No. 25) at 13, but there is no evidence in the record to support that assertion, and even if true, would not necessarily be sufficient to consider Defendant Revier similarly situated.

Since Plaintiff has not offered any other evidence to show that the reasons for her termination were pretextual, the Court finds that Defendants are entitled to summary judgment on this claim.  Therefore, Court **GRANTS** Defendants' motion with regard to Plaintiff's claims of employment discrimination on the basis of race and age.

**C. Wrongful Termination**

Plaintiff's third cause of action is for wrongful termination in violation of public policy. Because this claim relies on the success of her race and age discrimination claims under FEHA, see id. at 18, which claims have failed, the Court **GRANTS** Defendant's motion as to Plaintiff's wrongful termination claim.

**D. Emotional Distress**

Plaintiff has also alleged causes of action for intentional and negligent infliction of emotional distress. Such claims are preempted by the exclusive remedy provisions of the workers' compensation law when an employee suffers an injury that arises out of conduct normally occurring in the workplace. See Cole v. Fair Oaks Fire Protection Dist., 43 Cal. 3d 148, 160 (1987). However, discriminatory conduct committed by the employer is not within the normal incident of employment. Thus, claims of intentional or negligent infliction of emotional distress, to the extent they are based on discrimination, are not barred. See, e.g., Fretland v. County of Humboldt, 69 Cal. App. 4th 1478, 1492 (1999); Watson v. Department of Rehabilitation, 212 Cal. App. 3d 1271, 1287 (1989).

Nonetheless, "[a] simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged." Janken v. GM Hughes Electronics, 46 Cal. App. 4th 55, 80, 53 Cal. Rptr. 2d 741 (1996). One of the necessary elements of a *prima facie* case for IIED is "extreme and outrageous conduct by the defendant," see Cervantez v. J.C. Penney Co., 24 Cal 3d. 579, 593 (1979), and personnel management decisions do not rise to the level of such conduct. Janken, 46 Cal. App. 4th at 80. Therefore, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

As to Plaintiff's claim for negligent infliction of emotional distress, "[t]he negligent causing of emotional distress is not an independent tort but the tort of negligence. ... The traditional elements of duty, breach of duty, causation, and damages apply." McMahon v. Craig, 176 Cal. App. 4th 222, 1509, 97 Cal. Rptr. 3d 555, 560 (2009) (internal quotations and

1  alterations omitted).  Plaintiff alleged in her Complaint that Defendants breached their duty

2  of care: (1) to prevent unlawful discrimination against Plaintiff, (2) to avoid publishing false

3  and/or misleading statements about her work performance, and (3) to conduct a fair,

4  impartial, and good-faith investigation into the allegations against her.  SAC ¶ 61.  However,

5  the Court has found that there was no unlawful discrimination against Plaintiff.  Moreover,

6  the evidence in the record indicates that the investigation was fair and impartial.  While

7  Plaintiff argues that Defendant Revier did not have personal knowledge of how the reagent

8  at issue was used and did not personally make new reagents or re-run the lab tests, and that

9  Ms. Giles did not provide Plaintiff with certain information she had requested due to HIPAA

10 concerns, these criticisms do not have any significant impact on the overall impression that

11 the investigation was fairly conducted.  Therefore, the Court **GRANTS** Defendants' motion

12 as to Plaintiff's claims for intentional and negligent infliction of emotional distress.

13

14 **E.  Breach of Contract**

15      Plaintiff has also alleged causes of action for: (1) breach of contract, namely her

16 employment contract stating that she could only be terminated for just cause; (2) breach of

17 an implied contract to terminate only for good cause; and (3) breach of the covenant of good

18 faith and fair dealing.  Defendant argues that these claims are all preempted by Section 301

19 of the Labor Management Relations Act because they directly or indirectly implicate the

20 collective bargaining agreement ("CBA") between SCPMG and Plaintiff's union.

21      Because "[a] suit for breach of a collective bargaining agreement is governed

22 exclusively by federal law under section 301,"  Newberry v. Pac. Racing Ass'n, 854 F.2d

23 1142, 1146 (9th Cir. 1988), the Court finds that Plaintiff's sixth cause of action for breach of

24 contract is preempted by Section 301.  Moreover, because Plaintiff's eighth cause of action

25 is for breach of the covenant of good faith and fair dealing *in relation to her employment*

26 *contract*, see SAC ¶ 80, the Court finds that this claim is also preempted.  Cf. Newberry, 854

27 F.2d at 1147-48.

28      Finally, Plaintiff alleges the breach of an implied contract to terminate only for good

1   cause, based on "her length of employment, as well as defendants' actions, statements, and

2   conduct." SAC ¶ 72.  While such an implied contract may be considered nominally separate

3   from the CBA, the Ninth Circuit has recognized that any independent agreement of

4   employment is "effective only insofar as [it is] consistent with the collective agreement." Bale

5   v. Gen. Tel. Co. of California, 795 F.2d 775, 779 (9th Cir. 1986) (finding that § 301

6   preempted state law claims); accord Stallcop v. Kaiser Found. Hospitals, 820 F.2d 1044,

7   1048 (9th Cir. 1987) (same).

8        However, even if Plaintiff were to bring a Section 301 claim against Defendants, such

9   claims may be maintained "only if the employee can prove that the union as bargaining

10  agent breached its duty of fair representation..." Stevens v. Moore Bus. Forms, Inc., 18 F.3d

11  1443, 1447 (9th Cir. 1994) (citing Vaca v. Sipes, 386 U.S. 181, 186 (1967)) (internal

12  quotations omitted).  But the union was dismissed with prejudice in the earlier related action

13  in front of Judge Burns, see Case No. 09-cv-819-LAB-WMC (ECF No. 8), so Plaintiff would

14  not be able to maintain a Section 301 claim in any event in the absence of the union as a

15  defendant.

16       Accordingly, the Court **GRANTS** summary judgment for Defendants as to Plaintiff's

17  sixth, seventh, and eighth causes of action.

18

19  **F.  Defamation**

20       Plaintiff's ninth and final cause of action is for defamation.  Specifically, Plaintiff

21  alleges that Defendant Revier defamed her by telling Plaintiff's Laboratory Manager and

22  others that Plaintiff created a "wrong" reagent[4] and/or that Plaintiff created the Innovin

23  reagent "incorrectly."

24       To the extent that Plaintiff's claim is based on Defendant Revier's original statement

25  during the October 15, 2007 meeting, it is barred by the one-year statute of limitations, since

26  Plaintiff did not file this action until November 12, 2008.  See  Cal. Civ. Proc. Code § 340.

27  _____

28      [4] According to her deposition testimony, Defendant Revier concluded as a result of
her investigation into the erroneous test results that Plaintiff had created the wrong reagent
(namely, Thrombin instead of Innovin).

1    However, Plaintiff argues that the statements were republished on November 13, 2007 when

2    Plaintiff was terminated, and that this republication constitutes an independent claim for

3    defamation.  Plaintiff also claims that she was under a "strong compulsion" to republish the

4    statements to potential employers during job interviews.  See McKinney v. County of Santa

5    Clara, 110 Cal. App. 3d 787, 797-98, 168 Cal. Rptr. 89, 94 (Ct. App. 1980) (finding that

6    defendant could be liable for plaintiff's foreseeable republication of defamatory statements

7    where plaintiff was under a "strong compulsion" to do so).  It is well-established under

8    California law that parties have a separate cause of action every time the defamatory matter

9    is published.  See, e.g., Schneider v. United Airlines, Inc., 208 Cal. App. 3d 71, 76, 256 Cal.

10   Rptr. 71, 74 (Ct. App. 1989).

11         However, Plaintiff has not offered any evidence that she was compelled to republish

12   the statements to prospective employers.  Moreover, Defendants have offered evidence that

13   the only information they disclose to prospective employers is the former employee's most

14   recent hire date, original hire date, job title and termination date.  See Caraveo Decl. (ECF

15   No. 29-1)  ¶2.  They do not provide information regarding the circumstances of the former

16   employee's termination, including whether it was voluntary or involuntary.  Id.

17         Defendants also contend that the statements are privileged under California Civil

18   Code 47(c), which protects any communication made "without malice, to a person interested

19   therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the

20   person interested as to afford a reasonable ground for supposing the motive for the

21   communication to be innocent, or (3) who is requested by the person interested to give

22   the information."  If the privilege arises under Section 47(c), it is a "complete defense" to

23   defamation.  Brown v. Kelly Broad. Co., 48 Cal. 3d 711, 723 n.7, 771 P.2d 406 (1989).

24         Statements made about an employee's job performance within the employment

25   context – including statements to prospective employers – are generally privileged as

26   between interested persons as long as such statements are made without malice.  See, e.g.,

27   Deaile v. Gen. Tel. Co. of California, 40 Cal. App. 3d 841, 846-47 (Ct. App. 1974) (finding

28   that employer's statements made to plaintiff's coworkers regarding the reasons for her forced

retirement were privileged because they were made by and to interested persons); <u>Cuenca v. Safeway San Francisco Employees Fed. Credit Union</u>, 180 Cal. App. 3d 985, 996 (Ct. App. 1986) (finding that defendant's allegedly defamatory statements were "directly relevant" to plaintiff's ability to perform her job and were therefore of direct interest to the supervisory committee); <u>Noel v. River Hills Wilsons, Inc.</u>, 113 Cal. App. 4th 1363, 1371 (2003) (finding that statements to prospective employer about former employee protected by common interest privilege). Thus, unless Plaintiff can show that Defendant Revier acted with malice in making the statements, or that the employees who republished them in her termination statement and at the November 13, 2007 meeting did so with malice, her defamation claim fails.

Malice is established "by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights." <u>Hawran v. Hixson</u>, 209 Cal. App. 4th 256, 288, 147 Cal. Rptr. 3d 88, 115 (2012), review filed (Oct. 24, 2012) (internal quotations omitted; emphasis in original). Defendant Revier's description of her investigation at her deposition, <u>see</u> Def. Reply Separate Statement of Undisputed Material Facts (ECF No. 29-2) ¶ 50-55, amply demonstrates that she had reasonable ground for belief in the truth of the publication. Plaintiff stresses the fact that Defendant Revier disposed of the reagent once she concluded that it should not be used, thus preventing testing by anyone else. But this by itself is inconclusive, and Plaintiff has not otherwise offered any evidence to show that Defendant Revier did not in fact conduct the investigation. Nor has she offered any evidence to show that the managers responsible for her termination did not have reasonable grounds to believe that an investigation was conducted.

Thus, in order to preserve her claim for defamation, Plaintiff must show that Defendant Revier or the employees who republished the statements were motivated by hatred or ill will towards Plaintiff. But aside from bare conclusory allegations, Plaintiff has not offered any evidence to this effect. Therefore, Plaintiff's defamation claim fails, and the

1    Court **GRANTS** Defendants summary judgment on this claim.

2

3                            **IV.   CONCLUSION**

4           For the reasons above, the Court **GRANTS** Defendants' motion for summary

5    judgment on all counts and **DISMISSES** the action with prejudice.

6

7    **IT IS SO ORDERED.**

8    DATED:  January 3, 2013

9                                           BARRY TED MOSKOWITZ, Chief Judge
10                                          United States District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                  16                              10cv02676 BTM (WVG)